UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ZAFAR HASAN,

    Plaintiff,

v.

FOLEY & LARDNER, LLP,

    Defendant.

No. 04 C 5690
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff and Counter-Defendant Zafar Hasan ("Hasan" or "Plaintiff"), a former associate at the Chicago office of Defendant and Counter-Plaintiff Foley & Lardner, LLP ("Foley" or "Defendant") filed suit against his former firm, alleging discrimination under Title VII. Foley has also has filed two counterclaims against Hasan under the Federal Computer Fraud Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, and the Illinois Computer Tampering Act ("ICTA"), 18 U.S.C. § 720 ILCS 5/16(d-3) *et seq.* Both parties have filed for summary judgment on the opposing party's claims. For the reasons stated below, Hasan's motion for summary judgment is granted and Foley's motion for summary judgment is also granted.[1]

## FACTS

Hasan started working as an associate attorney in Foley's Chicago Business Law Department in October 2000. Attorneys in that department perform legal services related to mergers and acquisitions, securities and general corporate work. When Hasan worked at Foley,

---

[1] Foley also filed a motion to strike portions of the material Hasan submitted. I deny that motion because I was able to disregard inappropriate conclusions and legal arguments without much effort, otherwise the statement of facts was appropriate.

1

Edwin Mason was a partner and the Chairman of Foley's Chicago Business Law Department and from February 2002, Joseph B. Tyson was the nationwide Chairman of Foley's Business Law Department. Christopher Knight was the managing partner of Foley's Chicago office and Stan Jaspan was Foley's nationwide Managing Partner. Jaspan worked out of Foley's Milwaukee office and reported to Foley's Management Committee and its Chairman, Foley partner Ralf-Reinhard Boer.

Bryan Jung, Todd B. Pfister, George Simon and Robert Vechiola were all partners at Foley. Vechiola was Hasan's mentor and was responsible for furthering Hasan's professional development at Foley. Helen Toal was of counsel at Foley. John Cleary was formerly employed as an associate attorney in Foley's Chicago Business Law Department. During his time at Foley, Hasan worked with Vechiola, Toal, Pfister and Jung, but did not work with Simon.

Twice each year, Foley partners prepare performance evaluations for each of the associates that have worked for them. After the evaluations are prepared, the partners meet to discuss the performance evaluations. During the meetings, the attendees discuss each associate's performance evaluations. Then the attendees reach a consensus decision about how to rate the attorney's work performance and what action to take if the associate's performance has not met expectations. The associate's mentor compiles information from the written assessments, and the input provided at the evaulation meeting, in a consensus evaluation.

On or about June 27, 2001, Hasan received a performance evaluation from Mason and Vechiola. The evaluation stated that Hasan "needs to improve his attention to detail. He should analyze problems more completely and ensure that he delivers a more finished product." The evaluation also advised Hasan "to further develop substantive skills." As of June, 2001, Mason

viewed Hasan as needing further development, but not in immediate danger of being terminated for poor performance.

On Sept. 11, 2001, soon after hearing about the terrorist attacks on the United States, Cleary stated that he overheard Simon say "those people don't belong here . . . they should kick them all out." Cleary took Simon's reference to "those people" to be a reference to Palestinian Muslims. In the months after the attacks, Hasan began writing articles and making television appearances regarding Islam, American Muslims' reactions to the terrorist attacks, and Middle East politics.

In late 2001, Foley's Business Law Department had a large project referred to as "MINT" for client GMAC. Jung was one of the people responsible for managing the project and assigning work. Hasan requested to work on the project, but was not given any. However, Hasan had already worked on at least one other project with Jung during 2001, in which he had supervised two other associates. After the work was done, Jung received an email from the client's in-house counsel raising concerns about the work being done, including: (1) the excessive amount of time billed for the project; (2) the insufficient quantity of documents provided; and (3) the "sloppy" quality of the documents that were provided. Jung directed Hasan to prepare a memorandum responding to the client's complaints, which Hasan did on or about January 29, 2002. At the end of the project, Hasan received an email from the client stating that the Foley attorneys had done a great job.

On January 9, 2002, Hasan met with Mason and Vechiola and received his consensus evaluation for the 2001 fiscal year. The evaluation contained comments regarding Hasan's work performance from March 2001 to September 2001. Jung, Vechiola and Pfister all evaluated

Hasan individually. Jung and Vechiola had frequent contact with Hasan, but Pfister had only occasional contact. All three reviewers indicated that Hasan was on track for advancement.

Foley decided to terminate Hasan's employment during the October associate evaluation meeting. Hasan and Cleary both testified that Vechiola used the terms "nigger pile-on" and "sand nigger pile-on" to describe the process which followed comments Simon supposedly made during the associate evaluation meeting. Hasan also testified that Vechiola described the meeting by saying, "Too bad that George and those guys took out their religious dispute in Israel on you and had you fired."

Hasan testified that he later had a conversation with Pfister in which Pfister stated that Simon had once opposed an associate being made partner because she was pregnant, and someone told Simon that the pregnancy was not an appropriate partnership consideration. Hasan also claims that Pfister told him that Simon had no regard for employment laws and had done the same thing to Hasan. The associate that Pfister referred to in this story did become a partner. Cleary also testified that Simon had expressed concerns about the effect of the associate's pregnancy.

Foley originally planned on informing Hasan of his termination in late October 2002. On October 28, 2002, Mason sent an email to Stan Jaspan in the Milwaukee office informing him of the decision to terminate Hasan. The email stated that the decision to terminate was not unanimous and that Phelan and Tyson agreed that Hasan should be notified as soon as possible. Vechiola, in particular, did not agree with other partners that Hasan's substantive skills were at a lower level than they should have been. In the email, Mason stated that he had some background information that he wished to discuss, referring to the fact that Hasan was a Muslim.

4

In November 2002, Jaspan and Tyson engaged in a search to find another position for Hasan at one of Foley's offices outside of Chicago. Tyson admitted that searching for another position for a lawyer when the decision had already been made to terminate him was an unusual thing to do. Tyson did not have luck finding a new position for Hasan and wrote an email to Jaspan on November 22, 2002 seeking advice concerning "the well educated Muslim in Chicago."

In another email to Jaspan written the same day, Tyson stated that "I told them Zafar was bright, motivated, willing to travel anywhere, but Martin still says no. I'll tell Mark McSweeney that I have two types of associates – those who are in trouble and those who don't have enough work. I wouldn't send him the former." Tyson added that if a lawyer like Hasan cannot be transferred to a different department within the firm, then it would be difficult to transfer any attorney between departments at Foley.

At a meeting on December 5, 2002, Mason and Knight informed Hasan that he was going to be terminated, but could remain at the firm drawing a salary until March 14, 2003. Mason told Hasan that he was being terminated due to a lack of efficiency, a lack of attention to detail and that his technical skills were somewhat below class level. At some point, Hasan asked for this time to be extended until June 13. Foley still compensated Hasan and provided him with an office and access to their computer system through that date. Hasan downloaded the Internet Washer Pro program onto his laptop on June 12, 2003. He returned the laptop to Foley on June 13, his last day.

Sometime during June, Boer gave an interview to Crain's Magazine. During that interview, the reporter showed Boer what Boer believed to be a confidential Foley document, but

5

the interviewer did not say whom his source for the document was. Following the interview, Foley investigated who had accessed the document on its computer system.

On April 29, 2003, Hasan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Foley had terminated his employment on the basis of his race, color, religion, and national origin. Hasan filed an additional charge of retaliation with the EEOC on November 10, 2003, accusing Foley of making false accusations and threatening litigation over his alleged misappropriation and disclosure of confidential information. The EEOC issued Right to Sue Notices for both charges on June 10, 2004.

## STANDARD

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986). A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in Plaintiff's favor, allowing for all reasonable inferences drawn in a light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiff must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## HASAN'S MOTION FOR SUMMARY JUDGMENT

### The CFAA

The CFAA is a criminal statute, but it also provides a civil right of action for the victims.

6

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages.

18 U.S.C § 1030(g). The factor that Foley alleges Hasan caused was, "loss to 1 or more persons during any 1-year period . . . aggregating at least $ 5,000 in value." 18 U.S.C. § 1030(a)(5)(B)(I). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information . . . ." 18 U.S.C. § 1030(e)(8). "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service . . . ." 18 U.S.C. § 1030(e)(11).[2]

**Damage to a Protected Computer**

Hasan's first argument is that Foley cannot prove that he caused any "damage," as required by the statute. Hasan claims that, even though he installed the program on his computer, he never executed Internet Washer Pro or impaired the integrity or availability of any data, program, system or information and that Foley is unable to prove that he did so. Foley responds by pointing to evidence such as the fact that Hasan installed the program, the reason he installed it, the program's purpose and a witness' statement that Hasan had deleted files on the computer

---

[2] It is important to note that "damage" in the context of this statute is different from the monetary damages that Foley seeks for Hasan's actions. In order to avoid confusion, I will use the meanings of the terms as they are defined in the statute and use "monetary damages" to refer to the compensation Foley is seeking.

7

through use of the "delete" key.[3]

Foley claims that it is due to Hasan's own actions, which they are suing to remedy, that they are unable to determine whether or not he caused any damage. It cites *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006), in which the Ninth Circuit upheld the district court's dismissal of a plaintiff's claims and imposition of spoliation sanctions after the plaintiff intentionally destroyed evidence on his computer. While *Leon* could possibly be relevant to Foley's defense of Hasan's Title VII claims (if Foley is arguing that Hasan is guilty of spoliation), it is completely inapplicable to Foley's claims against Hasan under the CFAA. As a preliminary matter, *Leon* neither involves nor mentions the CFAA. Also, the plaintiff in that case had been specifically told that he had an obligation to preserve the data on his computer for the defendant. The defendant's expert subsequently discovered that the plaintiff had securely deleted over 2,000 files before transferring possession. The court then dismissed Leon's case due to his egregious actions. In this case, Foley has no evidence, through expert testimony or otherwise, that Hasan intentionally caused any damage by deleting even a single file with Internet Washer Pro.

---

[3] In his deposition, Haberkorn (a security engineer for Foley) stated that he did not know whether the program had been executed. In his declaration, filed with Foley's response, he states that he now believes that Hasan did execute the program. Significantly, Haberkorn does not state what, if any, subsequent investigation has changed his opinion on this important fact, nor does he provide some other, equally plausible, explanation. "[A] party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony. . . . '[W]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken . . . .'" *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). Therefore, I am disregarding Haberkorn's subsequent declaration. I also note that the declaration only states Hasan executed the program, which means that the program "performed the operations the user had directed to be performed." However, Foley has not submitted any evidence that one of the operations was to delete files. It could simply mean that he opened the

Citing *International Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006), Foley contends that simply the unauthorized installation of a program such as Internet Washer Pro is a violation of the CFAA. *Citrin* does concern a similar program, but Foley overlooks the fact that the plaintiff in that case also had evidence that files were deleted, not simply insinuation. Finally, Foley attempts to point out inconsistencies within Hasan's statements. However, without more, those statements are consistent with Hasan simply changing his mind about whether he should execute the program and delete data.

The Seventh Circuit has repeatedly held that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events," *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). Foley has had possession of Hasan's computer since he was terminated in 2003, yet it has not put forth any evidence showing that he actually deleted anything between the time when he installed Internet Washer Pro on June 12, 2003 and when he transferred possession of the computer on June 13, 2003. Even though the program would make it impossible to discover what was contained in the files that were "scrubbed," it does not hide the fact that a scrubbing occurred. Foley has not established a question of material fact as to whether Hasan caused damage to the computer through his installation of Internet Washer Pro.

**Loss in Excess of $5,000**

Even if Foley cannot prove damage, it may still prevail by showing that it suffered a loss in excess of $5,000. *See* 18 U.S.C. § 1030(a)(5)(B)(I); *In re Doubleclick Privacy Litig.*, 154 F. Supp. 2d 497, 523 (S.D.N.Y. 2001). The statutory definition of loss refers to the "cost of

---

program, did nothing, and then closed it again.

investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted." *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004). Although lost good will may be recovered "if it resulted from the impairment or unavailability of data or systems," *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 252 n.12 (S.D.N.Y. 2000), these costs cannot be unrelated to the computer itself. *Nexans*, 319 F. Supp. 2d at 474.

Foley claims that, due to the unavailability of data on Hasan's computer, it was unable to minimize its losses with respect to the Crains article. As a result, its good will in the business comunity was harmed and it suffered business losses due to lost work opportunities with clients and lost revenue from potential lateral hires who decided against joining Foley. Foley may not recover these damages under the CFAA. Assuming momentarily that the computer was impaired, the loss of good will and business damages were not a result of the impairment or unavailability of data on the computer. If those losses occurred, they were the result of the article.

Even though Foley argues that the unavailability of data made it impossible for it to respond to the article, those damages are too indirect to be considered.[4] "[T]he CFAA plainly enumerates a narrow grouping of 'loss' distinct from – and thus excluded – the far greater range of losses that could flow from a violation of the CFAA." *Resdev, LLC v. Lot Builders Ass'n*, No. 6:04-cv-1374, 2005 U.S. Dist. LEXIS 19099 at *11 (M.D. Fla. Aug. 10, 2005); *see also P.C. of Yonkers, Inc. v. Celebrations! the Party & Seasonal Superstore, L.L.C.*, No. 04-4554, 2007 U.S.

---

[4] In addition, Foley's claim that it needed to know what documents Crains had received in order to respond to the article is questionable, because it has not offered any proof that Hasan gave Crains any documents, and also because any documents Crains received were Foley's own

10

Dist. LEXIS 15216 at *17 n.2 (D.N.J. Mar. 2, 2007). "The additional types of damages awarded by courts under the Act have generally been limited to those costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system in the wake of a hacking attack." *Tyco Int'l (US) Inc. v. Does*, No. 01 CV 3856, 2003 U.S. Dist. LEXIS 11800 (S.D.N.Y. 2003). The losses that Foley is alleging are, in a word, speculative. For the same reasons, any expenses Foley claims as a result of having to work harder to defend itself from Hasan's lawsuit may not be recovered through the CFAA.

Since I have removed the amounts for lost good will and business damages, Foley must offer evidence showing that the costs of investigating and responding to Hasan's alleged tampering amounted to greater than $5,000. In its Response brief, it alleges that its "partners and technical staff were diverted from their normal duties to investigate Hasan's tampering with the laptop computer . . . ." However, Foley offers no evidence to back up its claims that the time spent surpassed the required threshold. It does not point to any deposition testimony claiming estimates by the partners and technical staff of the hours spent and the cost per hour, nor does it present time sheets, or anything other than its own bare assertion. "[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial." *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004).

Foley has not shown proof of damage to its computer system or losses in excess of $5,000 as a result of Hasan executing the Internet Washer Pro program. Hasan's motion for summary judgment for the CFAA claim is granted.

---

documents, which were still available in their computer system.

**ICTA**

The ICTA makes it a felony to tamper with a computer, in excess of the authority granted to that person, by doing the following.

> Insert[ing] or attempt[ing] to insert a "program" into a computer or computer program knowing or having reason to believe that such "program" contains information or commands that will or may damage or destroy that computer, or any other computer subsequently accessing or being accessed by that computer, or that will or may alter, delete or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being accessed by that computer, or that will or may cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such "program;"

720 ILCS 5/16D-3(a)(4). Furthermore, "[w]hoever suffers loss by reason of a violation of subsection (a)(4) . . . may, in a civil action against the violator, obtain appropriate relief." 720 ILCS 5/16D-3(c).

**"Loss" under the ICTA**

Hasan argues that Foley's ICTA claims fail for the same reason as its CFAA claims, Foley cannot show damage or loss. The ICTA differs slightly from the CFAA in that a violation can occur by simply "inserting" the program onto the computer, even if the program is never actually executed. Following the wording of the statute strictly would seem to imply that the installation of Internet Washer Pro could fall under its language. At the very least, there is a question of fact as to whether or not it would.

However, Foley may only bring a civil claim if a violation of subsection (a)(4) actually caused a loss. The ICTA does not offer a definition of the word "loss," and there have been precious few cases analyzing the statute. In *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219

(N.D. Ill. 2005), the plaintiff brought suit against the defendant for surreptitiously installing spyware on its computers. For damages, the plaintiff claimed that the spyware destroys other programs on the computer, slows down the computer, uses up bandwidth on the user's internet connection, decreases productivity, utilizes more electricity, decreases the useful life of the computer and causes increased internet charges. *Id.* at 1224-25. The court in *Sotelo* did not comment on whether the losses specified were among those encompassed by the statute.

Foley has an even more difficult time showing loss under the ICTA than under the CFAA. Since it has no evidence showing that Hasan executed the program, Foley would have to show a question of material fact that the mere installation of Internet Washer Pro onto the laptop caused a loss. Foley has not offered any such evidence. Therefore it cannot prove its claim under the ICTA, and Hasan's motion for summary judgment is granted for Count II of the counter-claims.

## FOLEY'S MOTION FOR SUMMARY JUDGMENT

### Employment Discrimination

Foley has filed a motion for summary judgment dismissing Hasan's Title VII complaint of employment discrimination and retaliation. Title VII makes it illegal for an employer "to limit . . . [an employee's] employment opportunities . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(2). There are two methods of proving discrimination, the direct method and the indirect method.

Proving discrimination through the direct method "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Garnering this type of evidence is a rare

13

occurrence, but Hasan may succeed by showing "a 'convincing mosaic' of direct or circumstantial evidence that could permit a reasonable jury to conclude that [Foley] acted with discriminatory intent." *Brewer v. Bd. of Trs. Of Univ. Of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). If circumstantial evidence is used, it "must point directly to a discriminatory reason for the employer's action." *Rhodes v. Ill. Dept. Of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (*quoting Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). Essentially, Hasan must produce evidence "from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class." *Troupe v. May Dept. Stores Co.*, 30 F.3d 734, 737 (7th Cir. 1994).

If Hasan does not have any direct evidence of discrimination, he may use the indirect method by showing that: (1) he is a member of a protected class; (2) he reasonably performed his job to the employer's expectations; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than a similarly situated person that was not a member of a protected class. *See Malone v. Am. Friends Serv. Comm.*, No. 06-2736, 2007 U.S. App. LEXIS 2364 at *7-8 (7th Cir. Jan 26, 2007); *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005).

**Direct Method**

Hasan claims that he has put forth enough evidence to create a "convincing mosaic." He claims that he can show bias by Foley partners and identifies 7 different ways that amount to his mosaic: (1) statements by Foley partners; (2) suspicious timing; (3) Foley's dishonesty; (4) conflicting oral and written statements; (5) consciousness of guilt; (6) violations of firm policy and procedure; and (7) other Muslims in the business law department.

**Statements by Foley Partners**

14

Hasan cites *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659 (7th Cir. 2006), to show how a supervisor's remarks can be used as part of a mosaic of evidence. *See Id.* at 666. However, he fails to note the differences in that case. In *Paz*, it was the plaintiff's direct supervisor that had made the statements concerning Mexican people and was accused of treating the Mexican employees she supervised in a discriminatory fashion. Here, the only partner that Hasan specifically names as someone that made discriminatory statements toward Muslim people was Simon. However, unlike *Paz*, Simon did not supervise Hasan on any assignments.

Since Simon was not his supervisor, Hasan instead attempts to show that Simon wielded some large amount of influence over the rest of the partners. The evidence Hasan presents, however, shows the opposite. He relates an example in which Simon tried to prevent a female associate from making partner because she was pregnant. In that example, even though Simon did not wish for the associate to obtain partner status, she did so anyway, so it does not show his influence. Hasan also names several committees that Simon was on, but does not put forth any facts showing that his position allows him to wield any power over the other partners.[5]

Even allowing that Simon had some input into the decision to terminate Hasan, the statements Hasan points to immediately after the September 11 attacks are not evidence of discriminatory intent because Simon did express those feelings around the time of the termination decision or in relation to that decision. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

---

[5] Hasan also brings up some statements from other partners that he believes advance his case. However, none of those statements provide direct evidence either. "[O]pinions of committee members regarding the motivation of other committee members do not constitute evidence of intentional motivation." *Butt v. Bd. of Trustees of E. Illinois Univ.*, 83 F. Supp. 2d 962, 973 (N.D. Ill. 1999).

15

**Suspicious Timing**

Suspicious timing, along with ambiguous statements and behavior directed toward employees in a protected group, may be circumstantial evidence of discrimination. *See Troupe v. The May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). However, the mere evidence that Hasan's hours fell after Sept. 11, 2001 does not raise suspicions. Hasan does not show any ambiguous statements or behavior from any of the partners that assigned him work.

**Foley's "dishonesty"**

Hasan lists several ways in which he believes Foley changed evaluations to increase criticism of Hasan, gave conflicting statements and engaged in other questionable behavior in order to make it easier to terminate him. He believes the actions are relevant because, "[d]ishonesty alone could be sufficient basis for a jury to conclude that a defendant is covering up a discriminatory motivation for an employee's discharge." *Paz*, 464 F.3d at 665. Here, again, Hasan draws an inappropriate analogy to *Paz*. The dishonesty at issue in *Paz* concerned whether or not the supervisor accused of discrimination had met with the center's acting administrator concerning the employee's allegations of discrimination. It was directly related to the issue of discrimination. Hasan can draw no such link.

**Consciousness of Guilt**

Hasan's arguments that Foley was conscious of its guilt in terminating his employment and subsequently acted in a manner consistent with terminating him unlawfully bear little weight. He attempts to twist a malevolent reason out of some of Foley's more benevolent actions, such as trying to transfer him to another department instead of terminating him and allowing him to stay longer instead of making him leave on the agreed-upon date, but his arguments on these points

are untenable. Most people would appreciate an employer's effort to transfer them, rather than end their employment, and when all else failed to give them ample time to find other employment.

It is also difficult to see how the mere mention of Hasan's religion in an email should draw suspicion without any further evidence showing that it influenced the decision. The fact that a law firm would pay attention to equal employment laws is not news, nor is it evidence of bias. According to Hasan, Mason stated to Vechiola that there was no basis for termination, Foley subsequently attempted to transfer Hasan to litigation, and when that did not happen they terminated him. This is a logical and reasonable course of events that does not show discrimination.

**Hasan's Remaining Arguments**

None of Hasan's remaining arguments are sufficient to create the mosaic that would enable him to survive summary judgment. If true, the alleged violation of firm policy by itself is still not evidence of discrimination. His statements concerning the current whereabouts of the other Muslims in his department are neither relevant nor evidence of discrimination against him.

**Indirect Method**

Curiously, Hasan does not even attempt to prove his prima facie case through the indirect method. Based on both the individual and consensus evaluations for Hasan and the deposition testimonies from Foley partners, there is clearly a question of fact as to whether Hasan performed to Foley's expectations. However, Hasan chose not to list any similarly situated individuals who were not in a protected class that were treated differently. Therefore, Hasan's discrimination claim is dismissed.

**Retaliation**

An employer is prohibited from discriminating "against any of [its] employees . . . because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to make a prima facie case of retaliation under the direct method, Hasan must show that he engaged in a protected action and, as a result, suffered the adverse employment action. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). In order to make a prima facie case of retaliation under the indirect method, Hasan must show that he: (1) engaged in a statutorily protected activity; (2) he met Foley's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees that did not engage in statutorily protected activity. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).

Hasan complains that Foley made false allegations toward him concerning improper use of Foley's computer system and threatening litigation. Foley claims that there was no adverse action taken against Hasan. Although Hasan had already been terminated, "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2409, 165 L. Ed. 345, 353 (2006). The provision covers "actions that would have been materially adverse to a reasonable employee or job applicant." *Id.*

The actions Hasan refers to do not rise to the level of a materially adverse employment action. Unless it can be shown that it is an abuse of process, filing a lawsuit would not be considered retaliation. *See Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006). So, it is

18

difficult to see how threatening a lawsuit could be considered retaliation. Hasan's retaliation claim is dismissed.

**CONCLUSION**

For the aforementioned reasons, Foley's claims under the CFAA and the ICTA are dismissed, and Hasan's claims under Title VII are also dismissed.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: JUL 2 6 2007